Good morning, ladies and gentlemen. We have a number of cases submitted on the briefs and we'll proceed with argument and Solis v. Millennium Pharmaceuticals. May I proceed? Good morning, Your Honor. May it please the Court, I'm Brooks Cutter, here appearing for Relator Frank Solis. We are reserving five minutes for rebuttal, which will be addressed by my daughter Selene Cutter, also arguing on behalf of Relator Frank Solis. So we appeal the decision of the District Court that Frank Solis is not an original source. This circuit in its en banc decision in Hartpence, which the Chief Judge sat on, made clear that only two things must be shown for Relator's standing. Disclosure to the government and direct and independent knowledge of the fraud. Disclosure is conceded here, so I'll turn to the direct and independent knowledge issue. As pled, a core part of the sales rep for the defendants was to pay kickbacks and inducements to doctors to recruit them as key opinion leaders. For example, ER 77 to 78, paragraph 66 to 72 of the Third Amended Complaint, included detailed discussion of the successful recruitment of Dr. Mike Lee to be a paid speaker and advocate for off-label use of Integroin. This recruitment was made and solidified by payment of speaker fees for showing up at a steakhouse. If there was any doubt about Frank Solis' quote direct and independent knowledge unquote, it's settled by ER 343. A business record that is a performance evaluation of Relator that says quote, Frank, you're doing a good job of grooming Dr. Lee unquote. And at ER 513 to 525, Frank Solis is evaluated on the ROI, the return on investment he is obtaining in the money he's putting out measured against Integroin sales for what he's spending on the doctors he calls on. A second example of Mr. Solis' direct knowledge of the fraud is his interactions at defendants direction with Dr. Harry Balian. Those interactions are described in detail at ER 82, paragraph 87 of the complaint. As pled, Dr. Balian directly asked Frank Solis to be paid as a speaker in exchange for prescribing Integroin and helping get it on to a hospital formulary. Solis, on behalf of the defendants, made that quid pro quo deal and sent Balian for speaker training in Colorado. Counsel, kickback is not enough. This is a false claims act, so there has to be a false claim to the federal government. I haven't heard any allegations that your client knew about false claims submitted to the federal government. Yes, thank you. I'll address that. So, what we have, what we're proceeding on is an implied false certification theory here. So, in effect, what Frank Solis did was engage in conduct that violated the AKS, which also violates the False Claims Act, causing, for example, Harry Balian to prescribe which prescriptions were then paid for by Medicare. We have this both on a micro and a macro level. We have business records that show the increased sales volume at the specific hospitals, and we also, on a macro level, included in the complaint are two sources for the Medicare information. One, the documented study showing the average age of the cardiac patients being treated with Integroin is 60. So, clearly, a large cohort are over 65 and being compensated, paid for by Medicare. And secondly, the national data that we submitted showing that approximately 60 percent of the Integroin prescribed is off-label. So, we have both indicia of false claims being submitted. The average age of the patients is well over Medicare. We have the specific records from Adventist. Don't, wouldn't you have to tie the false claims to the two doctors that you mentioned that your client knew allegedly received kickbacks? Yes, and we can, we do that, Your Honor, because what we say is that they increased their prescribing activity and prescribed because of the AKS activity. So, having made that prescription, those prescriptions included prescriptions for people who were medic, who, that were paid for by the, by Medicare. That, that's an inference that is, is plainly allowed under this court's rulings in, in multiple cases. The, the inference that when you have Medicare age people being illegally prescribed medication that Medicare paid for, you don't need to present the actual invoice. That's not, that hasn't been a requirement. But, I mean, it seems like speculation, though, that the two doctors that you mentioned that all their patients, or at least one patient submitted those forms for Medicare. Why couldn't they have all just paid cash? No, because these, these, the, this is a suit, a very expensive drug that was only administered in hospital in, so it cost tens of thousands of dollars to receive this infusion in the hospital. And it was, part of the targeted effort was, for example, that's documented in the complaint, is that Valiant would help get it on the hospital formulary so it could be billed through the hospital. So, it would be rare that you would have a relator who would have access to the hospital billing records and also been part of the scheme. This court has never held that both those things required. You can draw an inference on the second from the expense of the medication, the age of the patients, and the sheer volume, which is hundreds of millions of dollars of medication. And, and so, in terms of Valiant, ER 371 is a contemporaneous business record, a coronary acute care field coaching report, the documents paying $2,000 to Valiant for a talk, and at three, at page 373, and discussions with doctors of early use of the Integraline. Note that these interactions violate both the AKS and the FCA. Prescriptions paid for with inducements are not reimbursable claims, and they're also violations of the AKS. The deal with doctors on defendant's payroll, like Lee and Valiant, was not just to promote Integraline, it was to promote Integraline for unapproved off-label use. As pled and shown in the documents, there was a constant and concerted effort to drive, quote-unquote, upstream usage of Integraline. Upstream, as used in the documents, is synonymous with off-label. It means using Integraline for a use that was never approved for, in the emergency room, for outpatients. Do you acknowledge that off-label use, in and of itself, is not necessarily false? It's not necessarily a false claim for payment when it's done that way? Yes, I agree with that, Your Honor, I do. Here, though, what you have is not independent decisions by doctors, but decisions influenced by, tainted by, AKS payments, and also by inaccurate information provided. For example, at ER 319, there's a hospital project plan that discusses the plan to use Lee to sell the message to hospitalists who can start Integraline, quote, upstream, unquote. These interactions established that recruiting and paying key opinion leaders to prescribe Integraline and get part of Frank Solis' job, and one he was evaluated on. Frank Solis, in this regard, is a prototypical relator, hands-on, eyes-on, in the allegations of the complaint. What the First Circuit in Bannigan said was the easiest call on directness, where the relator has, quote, personal observation of a fraudulent act or participation in it. Bannigan didn't have that, but still had standing. Here, Frank Solis does, and the direct and independent knowledge required by Hartpence is amply documented in the complaint. I'm going to spend a few minutes now on the defendants' cross-appeal seeking a dismissal under Rule 9b. Before you move on, so for the off-label claim, doesn't there have to be an allegation that there was an inappropriate or unreasonable prescription of the drug that was submitted to Medicare? Yes, I mean, there is that. That's well-documented in the complaint that approximately 60% of the usage ended up being off-label for upstream ER and other uses. But then you need to prove that that upstream or off-label use was also unreasonable or not medically necessary. For some of the claims, not for the claims influenced, tainted by AKS conduct. Those would fall under the false, not be eligible for payment under the False Claims Act, either. I'm sorry, what was that? I missed that. So the claims that, for claims that are untainted by kickbacks, you would have to show that. But for claims, and we believe the complaint does allege that, but for claims that are tainted by kickback conduct, that also violates the FCA independently. So off-label or on-label. So the district court actually did, perhaps provided a very descriptive analysis of the second amended complaint that equally applies to the third amended complaint when it denied the 9b motion in 2015. The court said the SAC describes in detail moving defendants alleged actions between 2002 and 2009 to convince physicians to write prescriptions of Integraline for off-label uses. Those purported kickback activities included funneling grants, paying excessive spaker fees, providing honoraria, furnishing meals, paying for attendance at CME seminars, or retaining control of virtually every aspect of the event so as to justify off-label use, and funding preceptorships and advisory boards. The SAC provides both dates and details of these alleged kickback activities, including separate and specific meals, which were later alleges that these activities violate both the FCA and the AKS. The SAC further provides examples of rewarding high prescribing doctors with excessive speaker fees and alleges that certain hospitals were tracked in order to determine which to provide more expensive meals. That's the district court's analysis of the SAC when the district court reviewed the SAC for specificity and found it adequately pled in 2015. That's at ER 41. The TAC has far more specificity than the SAC. The court conduct in the complaint plainly meets this court's standard for a successful implied false certification case as described in Rose, which is a post-ESCO bar decision. That is, whether a reasonable trier of fact could conclude that the prescribed makes the hospital certification of compliance false and those payments improper under the FCA. Here, the direct payments for sham speaking events and entertainment at expensive dinners taints those prescriptions by those prescribers and makes them ineligible for payment. And the aggressive promotion crossing the line of actively driving business to off-label means that those prescriptions are not eligible for reimbursement either. The court conduct in the complaint alleged with multiple examples and contemporaneous business records violated both the ATS and the FCA, so this court should deny the defendant's appeal under Rule 12 and I'll reserve. Thank you, counsel. And we have a time division, so Mr. Commons, I think you're up first. Is that right? It is, your honor. Thank you. Good morning. May it please the court. Sean Commons on behalf of Millennium Pharmaceuticals, Inc. The district court appropriately dismissed this action for lack of jurisdiction on the ground that Relator had not established knowledge, direct knowledge, of the allegations underlying his claims and the district court had good reason to do so. This case is nearly 12 years old. Relator had three opportunities to amend, each after a trip to this court where it found all of the claims barred or the subject to the public disclosure bar. It was in that context the district court appropriately found no further amendments would serve any purpose because the question of whether or not Relator has direct knowledge is something uniquely within his possession. If he couldn't do it then, there's no reason to think he could do it now. Mr. Cutter focused really heavily on the Sure, your honor. For those two claims, there are two issues we have. One is that they're citing national data. That by definition would be something not within the direct knowledge or doesn't qualify as direct knowledge information for purposes of jurisdiction and the original source test. The other issue is that you do need to have some connection, some awareness of an actual false claim. And the Al-Flatouni case and the Meyer case, the Harshman case and even the Prather case all demonstrate that. I'll focus on Al-Flatouni in light of some of the arguments that Relator has been making today. In Al-Flatouni, you had a physician who was treating multiple patients and he alleged that there was a 50% increase in referrals after the alleged start of the scheme and that based on his review of the records, 50% of them were missing required information about referrals. And in that setting, the court said that is not enough to establish original source status because he did not, he was not able to connect a specific treatment to a specific false claim for payment. And if that is for a physician who's treating patients and someone who merely alleges that they either had lunches with nurses or events with physicians, is one step removed and has even less of a basis under this circuit's law for establishing original source status. Now, Relator pointed to the Bannigan case, which is obviously not Ninth Circuit precedent, it's a First Circuit case. And there, the reason, the case is distinguishable for a couple reasons. One is the defendant's theory was that the only way you could be an original source is if you personally participated in the fraud. And the court understandably said whistleblowers don't have to necessarily also be fraudsters. The other one was that in that case, the alleged fraudulent theory was about how to trick Medicaid into paying higher reimbursements to pharmacies. The whole theory, the exact fraudulent theory, was about profiting off of Medicare and how to help pharmacies profit over Medicare. The Relator directly communicated with the people who implemented the scheme and actually was aware of and could produce the contracts that showed how the pharmacy and the defendants would execute that scheme to affect a profit-taking enterprise. And that, again, is a much different and much closer basis for the Relator saying essentially, I went to lunch, I went to lunches and dinners with people and therefore I think that they may have been, that they may have viewed that as a quid pro quo and that that may have changed prescribing practices even though we don't have any direct knowledge that the physicians that he supposedly had these events with, in fact, changed their practices or that there was any resulting claim for payment that would not otherwise have been made. Why isn't an inference enough? I'm just looking at the statute and it says original source only requires direct and independent knowledge of the information on which the allegations are based. It doesn't say they must know every facet of the crime or the allegation. It just says allegations of which they are based. So if he has good knowledge of the bulk of the allegations, why is that not enough? Because the core of any False Claims Act claim is a false claim for payment. And so just having awareness of a fraudulent scheme, if that was sufficient and just having awareness of your overall allegations, then Al Flatouni would have come out the other way, as would Meyer, because in both of them they could say, based on their direct experience working at the facilities and treating patients who allegedly never needed the services and had no reason to be in the programs, they were not able to overcome the hurdle. And if they're not able to overcome the hurdle, then it can't be sufficient just to say, I'm employed, I was aware, I have a reason, based on my own personal experience, to believe that fraud is occurring and that that fraud may be resulting in false claims for reimbursement to the government. I mean, is the problem here, based on what you're saying, less is independent knowledges of things that are not actually problematic under the False Claims Act? He has independent knowledge of something. It seems the question is, what is that something? And here I take your argument to be that something is conduct that doesn't actually violate the False Claims Act. Well, that is correct, Your Honor. It's a separate point. I mean, we're focused really on the direct knowledge element. But it's clear under this Court's law that just alleging a fraudulent scheme or alleging that fraudulent behavior has occurred is not sufficient to state a claim. And it would, so it can't be sufficient to establish original source status when, as here, all of the claims were subject to public disclosures prior to the filing of the suit. That would be the... Under that theory, wouldn't only accountants be able to state, to allege a False Claim Act then? Because they're the only ones that have direct knowledge of the billing to Medicare and all that, you know, stuff. Well, a couple answers that, Your Honor. One is that obviously we're only talking about the original source test because Relator wasn't the whistleblower. Some other people filed lawsuits prior to this one. So that's one. The other one is that under the current law, there's no longer the direct knowledge requirement. But the most direct answer to your question, Your Honor, is no, you could come up with lots of scenarios where someone other than an accountant would be aware of an actual claim for payment. But they would have to have some information about the presentation. And there are cases, it's interesting that you pointed that out, but some of the cases that are in the brief, that's what we, what, who the Relators were. They were people who were Medicare billing specialists. Or they were people who directly worked with the billing. And Bannigan, again, is a good example of someone who knew and was part of the program where the entire design of it related to how to falsely bill and generate higher things specific to Medicare. It wasn't, you know, a general alleged scheme to increase sales of a product. It was specific to how to execute a scheme to defraud Medicare. And that would be the difference, Your Honor. I see that my time is up. Thank you very much. Thank you, Counsel. We'll hear from Merck. Thank you, Your Honor. May it please the Court, Doug Hallward Greenmeier from Ropes & Gray on behalf of the Shearing & Plow Merck defendants. We adopt all the arguments of our co-counsel with respect to the lack of jurisdiction, as the District Court found. But to the extent that the Court believes it does have jurisdiction, then the relator's claims should be dismissed on the basis of 12b6 and 9b, really for the same reasons that the District Court identified in its ruling under 12b1. In fact, there are two decisions of this Court that are controlling in this appeal if the Court reaches the merits and compels dismissal. The first of those is the Court's recent decision, Dan Abrams' case, which we submitted under Rule 28J, which forecloses relators' off-label promotion theory. That case held without any question that reimbursement under Medicare depends upon whether the use, whether on-label or off-label, was reasonable and necessary. The relator's mention of the reasonable and necessary standard, much less established by any claim, would not have sufficed, especially when a relator's theory is that the defendants shared peer-reviewed journal articles that supported the off-label use and which would be a basis for determining that that use was reasonable and necessary. Does that point you just made, is that point also relevant to the original source analysis? I mean, can you repackage that and say, well, it essentially shows that whatever he had independent knowledge of, it was not independent knowledge of something on which a false claims act claim could be founded? Your Honor is exactly right. The arguments on the substance and original source are very complementary, and that's understandable because the original source test is designed to require more of that person who is trying to stand in the government's shoes and collect the bounty when that person did not bring the whistleblowing allegations to light. We expect more of that person, and so they need to have had original knowledge of these deficiencies. So it's all grounded in the deficiencies that render the claim false, and so where, as here, relator doesn't have knowledge of the actual circumstances of the individual uses of the product, he can't provide allegations to support the notion that any single patient was treated in a medically unnecessary or unreasonable way, and for the same reason, he doesn't have independent knowledge of that. So those off-label claims are foreclosed for lack of jurisdiction because of that defect, but if the court reached the merits, we think for the same reasons, it would fail under 12b-6, and I take relator's counsel's argument this morning to largely concede that. So I'd like to proceed to the AKS arguments, and again, I think that two decisions of this court foreclosed the AKS theory of liability, and those are, again, the Dan Abrams case, but also this court's prior panel decision in this very case, because in the prior panel decision, the court dismissed, under rule 9b, after concluding that it had jurisdiction over the Avalox claims because it said that they were highly generalized and did not provide the kind of particulars of individual doctors who had received payments, then participating in prescribing decisions for patients for whom Medicare reimbursement was requested, and that is equally true of the Integralind claims. In fact, the majority of the allegations in the complaint with respect to kickbacks are alleged with respect to Integralind and or Avalox, or with respect to defendants' drugs. By definition, if those allegations were insufficient with respect to Avalox, they are equally insufficient with respect to Integralind, and with respect to the more, the allegations that do reference Integralind, again, the Solis case disposes of, for example, the formulary allegation, and the relator, I think, probably thinks he's identified his, you know, best of on pages 27 to 28 of the yellow brief, the first of which is a lunch that was had with a pharmacist. The pharmacist does not prescribe anything. The pharmacist, at best, puts something on formulary, but that simply makes it available, and the court has already decided in Solis and Dan Abrams that simply making available is not enough. If we proceed through the others, the next allegation is with respect to Dr. Gibson. Dr. Gibson was a Harvard faculty member who was paid to give speeches about his research and experience with Integralind. There are no allegations about Dr. Gibson's own prescribing habits. All that is alleged is that those who heard Dr. Gibson describe his scientific knowledge, his research and experience with the product, then used Integralind more frequently. That is merely the scientific process. That's the sharing of information. That is not an anti-kickback statute violation. So, there is no one with whom, as to whom, relator alleges a payment, much less a payment that is excessive anyway. There's no allegation about what a non-excessive speaker fee would have been, and then, with respect to that person, that that person then subsequently prescribed Integralind to a Medicare patient, much less that they prescribed it more often because they had been paid this excessive fee, much less that that claim was subsequently submitted to Medicare. All of the things that would be required under this court's precedent are lacking in this complaint. Is it going to be the case that every time the underlying false claims allegations actually fail to state a claim that, at least in a key TAM case, the relator will therefore not be an original source and we would lack jurisdiction? I mean, is there any daylight between these? No, I think, Your Honor, that, first of all, as my co-counsel mentioned, this is the exception to the rule. In any instance in which there was not a prior public disclosure, original source is not implicated and, therefore, that inquiry does not arise. I do think that there are going to be instances where a relator has a direct and independent knowledge of the allegations that they're relying on, but they simply are not sufficient under the standard. If, to the extent that this relator had independent knowledge of individual patients who were being prescribed integral and off-label, but it was entirely consistent with the published peer-reviewed articles, which is a standard for reimbursement, then he would have independent knowledge. He would be a proper relator, but it would still fail on substantive grounds. Has this relator not done that here, in terms of the, as he not alleged, direct and independent knowledge of something? Well, only at the most general level. Indeed, it's interesting that with respect to the medical science liaison letters that the relator identifies, none of those has an actual addressee. He's printed something off of a, you know, off of a C drive of a computer, but it's not an actual letter that went to anyone. So he doesn't know who received these letters that included copies of these published peer-reviewed articles, much less does he know who were the patients for whom they were used and whether the individual circumstances were such that it would have been unreasonable. And I'd like to just point out that under the Medicare reimbursement standard, a relator in their reply brief suggests that this determination of reasonable and necessary has to be made in advance. They cite a regulation that is irrelevant to the inquiry, but the benefit policy manual section 50.4.3 says that determinations as to whether something is reasonable and necessary for an individual patient are to be made by the Medicare carrier. A decision can only be made with respect to an individual patient after the fact. I mean, especially if this is something that's being prescribed in the ER, if somebody comes in with a heart attack, that can't be made in advance. It can only be made after the fact and only on the basis, as the regulations says or guidance says, for an individual patient. We have no allegations with respect to individual patients, which he would have to have a direct and satisfied original source. But if you get beyond that, he also would fail with respect to specificity or 12B6 because, again, he's not employing the right standard. And I want to underscore that with respect to... Counselor, you're over your time. Okay. Thank you very much, Your Honor. We'll hear rebuttal. Good morning, Your Honors. I'm Selene Cutter. I'll just be addressing the points made by the defendants here. First of all, as for the original source, the standard applied by the district court and advanced by the defendants here that Mr. Solis is not an original source because he didn't play a role in actually submitting the claims for reimbursement to Medicare is not the correct standard. Neither the False Claims Act nor any precedent holds that a relator must have personally submitted the false claims in order to be an original source. As Your Honor pointed out, there are many types of fraud which are not apparent on the face of a bill, including here where the bills or requests for reimbursement from Medicare appear normal on their face. So there is really no reason to require Mr. Solis to have submitted false claims himself because he has... Well, the allegation is not that he needs to submit the claims himself, but he has to at specific claims being submitted to the government. Well, the standard, I believe, Your Honor, is that it is sufficient to pair reliable indicia of claims actually submitted, and we have certainly pleaded that. We have evidence that the defendants targeted Medicare populations at certain hospitals, that they targeted these hospitals because they had a high Medicare patient population. They tracked the stays of Medicare patients at those hospitals. We list a number of hospital action plans where sharing specifically tracked the stay of Medicare cardiology patients at these hospitals and how much their average spend was, how much Medicare's average spend was for these patients. We also know that the defendants and Mr. Solis were tracking the increase in sales at these hospitals. So we know that there's a high Medicare population, and we know that they're tracking the sales. So we have these reliable indicia that the sales are actually going to Medicare patients. If that were true, then what about Al Futuni, where the court dismissed the case because it couldn't name one patient that was a false claim? Dr. Al Futuni had no direct knowledge of the scheme at all, and that was really the issue. He only figured it out after the fact. He was not involved in any of the conduct. And so that was really the distinction that we made there. He was not... having anything to do with the actual fraud. He only deduced it from looking at the bill and talking to patients after the fact, whereas Frank Solis was an active participant in the scheme to pay kickbacks and promote the off-label use. But I thought earlier you started the argument by saying that there's no need under the false claims for the relator to play a part in the scheme. So you're saying they have to play part in part of the scheme, but not all of the scheme. Is that your argument? Yes, Your Honor. I believe that the fact... even though it may not be a requirement, Mr. Solis has done it. He was participating. He has direct knowledge of the actual fraudulent conduct that took place here. And so that's the key distinction. While the submission of the claims itself... I guess what part of the false claim allegation does a relator have to be personally part of for the relator to be the original source? You're saying it doesn't... the relator doesn't have to be part of the billing part, but has to be part of the fraudulent part? Exactly, Your Honor. So if the fraud is taking place... Where's that based out of? So I believe this is based on reading the different cases that the court has ruled. For example, in Hartpence, while the relator had direct knowledge of the actual scheme for billing, which was the fraud alleged. But in other cases, for example, in Wang and in Barajas, Matisky, those relators were not participating in the actual submission of claims, but they fraud alleged is a billing code problem, it's important for the original source to have viewed that, to have seen that problem take place. In Meyer, for example, the nurses were dismissed as not original sources because the scheme that was actually going on was a fraudulent billing scheme, which they did not have knowledge of, even though they had seen the patient. So where the fraud is a cooking the books type of fraud, yes, an original source has to see it. But where the fraud is taking place in a different place, when it's in the meetings with the doctors or at a steakhouse, that's the part that the relator has to have seen with their own eyes. I'd like to move on to address the specificity argument. I believe that the complaint has more than surpassed the requirements of Rule 9b. We have the dates and places of all of the meetings that Mr. Solis personally participated in, the amounts that he paid to these various doctors, and I see that I'm out of time, Your Honor, so I don't want to go on too long if you have no further questions. I think we have your argument in hand, so thank you very much. Thank all of you for your arguments this morning and for your briefing, very helpful to the court. And the case just argued will be submitted for decision.
judges: Thomas, Bress, Bumatay